UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------
ISSAC GRIFFEL,

                              Plaintiff,

                              v.

NANCY A. BERRYHILL,[1]
*Acting Commissioner, Social Security Administration*,

                              Defendant.

**MEMORANDUM & ORDER**
16-CV-1772 (MKB)

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Issac Griffel commenced the above-captioned action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for social security disability insurance under the Social Security Act (the "SSA"). (Compl., Docket Entry No. 1.) Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that Administrative Law Judge Mark Solomon (the "ALJ") erred by failing to give controlling weight to the opinions of Plaintiff's treating physician in determining Plaintiff's residual functional capacity ("RFC"). (Pl. Mot. for J. on the Pleadings ("Pl. Mot."), Docket Entry No. 10; Pl. Mem. of Law in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 10-1.) The Commissioner cross-moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that substantial evidence supports the ALJ's decision that Plaintiff was not

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the caption has been updated to reflect the new Acting Commissioner of Social Security, Nancy A. Berryhill, who took office on January 23, 2017.

disabled. (Comm'r Cross-Mot. for J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 13; Comm'r Mem. of Law in Supp. of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 14.) For the reasons discussed below, the Court grants Plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings and remands the case for further proceedings consistent with this Memorandum and Order.

**I. Background**

Plaintiff is currently sixty-four years old. (Certified Admin. Record ("R.") 30, Docket Entry No. 9.) Plaintiff has a high school diploma. (R. 30.) Prior to 1996, Plaintiff worked as a diamond retailer, and from 1996 to 2011, Plaintiff worked as insurance agent. (R. 32, 37–38, 182–83, 219.) In 1997, Plaintiff began treatment with Yehuda Nir, M.D., a psychiatrist, because Plaintiff believed he was suffering from depression and anxiety. (R. 38, 65, 219–20.) In 2009, Plaintiff stopped treatment with Dr. Nir and began treatment with Mikhail Pilman, M.D., for his depression and anxiety. (R. 159, 182, 219–20.) Due to Plaintiff's depression and anxiety, Plaintiff stopped working in March of 2011. (R. 31–32, 180.)

On February 7, 2013, Plaintiff applied for social security disability insurance, asserting that he had been disabled since March 31, 2011, due to depression, anxiety, panic attacks and insomnia. (R. 53, 139.) A disability adjudicator issued a report on May 30, 2013, denying Plaintiff's application. (R. 72–82.) Plaintiff requested a hearing before an administrative law judge, which hearing occurred before the ALJ on December 10, 2014. (R. 26–52, 89.) After the hearing, the ALJ found that Plaintiff was not disabled. (R. 11–22.) Plaintiff filed an appeal challenging the ALJ's decision. (R. 8.) The Appeals Council declined review, and Plaintiff filed a timely appeal with the Court. (R. 1–3; Compl.)

### a. Hearing before the ALJ

On December 10, 2014, the ALJ held a hearing regarding Plaintiff's application for social security benefits. (R. 26–52.) The ALJ heard testimony from Plaintiff and Miriam Green, a vocational expert. (R. 26–52.) Plaintiff appeared at the hearing with counsel. (R. 28.)

#### i. Plaintiff's testimony

Plaintiff testified that he last worked in 2011 as an insurance agent, which involved seeking potential clients to purchase insurance coverage. (R. 31–32.) Before working as an insurance agent, Plaintiff was self-employed as a diamond retailer, but he was forced to close his business because people "stole a lot of money" from him. (R. 37.) Plaintiff stopped working as an insurance agent because his "depression [and] anxiety got worse" and he "was unable to continue looking for clients." (R. 32, 37.) Plaintiff's depression and anxiety worsened in 2011 because he was having issues with his landlord. (R. 33, 39.) When Plaintiff's anxiety caused panic attacks, instead of going to the hospital, Plaintiff would lie in bed to relax. (R. 34.) Plaintiff's depression and anxiety caused fatigue and insomnia, and as a result, Plaintiff slept at random times and for random intervals. (R. 40, 42.)

At the time of the hearing, Plaintiff lived with his wife. (R. 33.) Plaintiff's wife handled all of the household chores, which she did even before Plaintiff began suffering from depression and anxiety. (R. 35.) Plaintiff cared for his personal hygiene. (R. 34–35.) Plaintiff could travel via public transportation, but only during times when there were not many other people using public transportation. (R. 33–34.) Plaintiff tried to read the newspaper daily, but would get bored after a few minutes. (R. 36.) A few times a week, Plaintiff attended religious service at a synagogue. (R. 35–36.) Plaintiff only spent time with the members of the synagogue at religious services and did not have any friends that he spent time with otherwise. (R. 43–44.) Plaintiff often arrived late to services at the synagogue because he was unable to rest well due to

his insomnia and therefore could not get out of bed. (R. 36–37.) Plaintiff's insomnia also made it difficult for Plaintiff to maintain a schedule or arrive on time for appointments. (R. 42.)

Plaintiff felt no joy or pleasure with anything in his life, including spending time with his family, celebrating religious holidays and going to synagogue. (R. 34, 36–38, 40, 42–43, 45–47.) Plaintiff always felt too depressed or anxious to attend weddings and family gatherings. (R. 38, 43.) Plaintiff's depression was exacerbated in 2012, when one of his grandchildren passed away due to cancer. (R. 40–41.) In addition, being unable to work due to depression and anxiety worsened Plaintiff's condition. (R. 45.) Plaintiff did not suffer from delusions, but occasionally had suicidal thoughts because of the effect his depression and anxiety had on his life. (R. 43–44.) Plaintiff's medication lessened the gravity of the depression and anxiety, but did not eliminate their effects. (R. 43.) Plaintiff believed he could not work because being around other people increases his anxiety and if he were to be criticized by a coworker or supervisor, he would suffer a panic attack. (R. 46.)

### ii. Vocational expert testimony

Green, the vocational expert, testified at the hearing after reviewing the evidence in Plaintiff's record. (R. 47–48.) The ALJ asked Green to assume a hypothetical claimant for disability benefits with the following limitations:

> no exertional limitations. He can remember, understand, and carry out simple instructions, make simple work-related decisions, maintain a regular schedule, maintain attention and concentration for rote work, and can perform a low-stress job, defined as one with no close interpersonal contact with the general public and not requiring high[-]volume or assembly-line production quotas.

(R. 48.) The ALJ asked Green what jobs such a person could perform. (R. 48.) Green testified that such a person could perform "medium exertional level" jobs as a "laundry worker," "hand packager" and "linen room attendant." (R. 48–49.) The ALJ posed additional limitations for the

4

hypothetical claimant and asked Green for her opinion on available jobs in the economy. (R. 50–51.) The ALJ asked what if such a person were "expected to be off task more than [ten] percent of" the work day, and Green testified that there are no jobs available for such a person. (R. 50.) The ALJ asked what if such a person were "unable to handle stress at any level," and Green testified that there were no jobs available for such a person. (R. 50.) The ALJ asked what if such a person "could [] have no close interpersonal contact at all with either supervisors, coworkers, or the general public," and Green testified that there were no jobs available for such a person. (R. 50–51.)

### b. Plaintiff's impairments

#### i. Dr. Mikhail Pilman

In December of 2009, Plaintiff met with Dr. Pilman for an intake psychiatric examination. (R. 219.) Plaintiff complained of depressed mood, feelings of worthlessness, decreased energy, restlessness, difficulty concentrating and poor memory. (R. 219, 230.) Plaintiff reported that he started receiving psychiatric treatment in 1997, after he closed his diamond business, because he "lost [his] whole self-esteem." (R. 219.) Plaintiff reported that he was taking medication for his depression and anxiety. (R. 224.) Plaintiff also reported having "passive suicidal thoughts," such as dying from being hit by a car, but had no intention to commit suicide. (R. 220.) Dr. Pilman noted that Plaintiff had a withdrawn demeanor, average intellectual functioning, fair concentration, blunted affect, depressed and anxious mood, and issues with his sleep and energy level. (R. 227, 232.) Dr. Pilman opined that Plaintiff's depression and anxiety were due to financial and familial problems. (R. 229.) Dr. Pilman diagnosed Plaintiff with major depressive disorder and issued a rule-out diagnosis for anxiety

disorder.[2]  (R. 224.)  Dr. Pilman prescribed Plaintiff medication to treat his depression, anxiety and insomnia.  (R. 233.)

From January of 2010 to October of 2014, Plaintiff attended weekly psychotherapy sessions with Howard Gold, L.M.S.W., a social worker in Dr. Pilman's office, and monthly psychiatric visits with Dr. Pilman.  (R. 215–18, 235–53, 326–89, 396–417.)  The notes from the visits are predominantly the same.  (*See* R. 215–18, 235–53, 326–89, 396–417.)  Dr. Pilman's notes reflect that Plaintiff was moderately or markedly depressed and suffered from constant anxiety due to financial and familial problems.  (*See, e.g.*, R. 215, 326.)  Dr. Pilman noted that Plaintiff had a sad and anxious mood, constricted affect, and a memory that was "[within] normal limits for [his] age."  (*See, e.g.*, R. 215, 326.)

In May of 2012, Dr. Pilman noted that Plaintiff was progressing because he was starting to help his wife with her handbag business two days a week.  (R. 361.)  Dr. Pilman always refilled Plaintiff's prescriptions for medication to treat his depression and anxiety.  (*See, e.g.*, R. 326.)  Dr. Pilman prescribed Plaintiff medication to treat his insomnia only for April of 2013.  (R. 339–41.)

In November of 2014, Dr. Pilman completed a psychiatric assessment related to Plaintiff's application for disability benefits.  (R. 391–95.)  Dr. Pilman noted that he had been treating Plaintiff since December of 2009, and Plaintiff visited his office weekly for psychotherapy treatment and monthly for psychiatric treatment.  (R. 391.)  Dr. Pilman further noted that Plaintiff had major depressive disorder and generalized anxiety disorder.  (R. 391.)  Dr. Pilman opined that Plaintiff had a "markedly depressed" mood, "constant high-level anxiety,

---

[2]  A "rule-out" diagnosis means that the physician is unable to make a medical determination based on the evidence currently available to him or her.  *See Talavera v. Astrue*, 697 F.3d 145, 150 (2d Cir. 2012).

excessive worrying," "racing anxious thoughts," "low energy" and "difficulty concentrating." (R. 391.) Dr. Pilman noted that Plaintiff had prescriptions for medications to treat his depression and anxiety, and opined that "despite taking high doses of antidepressants and tranquilizers, [Plaintiff's] symptoms remain[ed] pronounced and significantly interfere[d] with [Plaintiff's] functional capacities." (R. 391.) Dr. Pilman also opined that Plaintiff's disorders prevented Plaintiff from "keep[ing] a permanent job" since approximately 2004. (R. 394.)

The assessment form asked Dr. Pilman to select whether Plaintiff's disorders caused no, "mild," "marked" or "extreme" limitations that affected Plaintiff's ability to complete activities of daily living, function socially and concentrate.[3] (R. 392.) Dr. Pilman opined that Plaintiff had "marked" limitations in performing activities of daily living such as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring for personal hygiene, [and] using telephones"; "marked" limitations in social functioning, which is "the capacity to interact appropriately and communicate effectively with other individuals"; and "extreme" limitations in "concentration, persistence or pace, [which] result[ed] in [a] failure to complete tasks in a timely manner." (R. 392, 394–95.) Dr. Pilman further opined that Plaintiff's disorders qualified as a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate." (R. 393.) Dr. Pilman also opined that Plaintiff could not "make occupational adjustments" such as understanding, carrying out and remembering instructions, responding appropriately to criticism from a supervisor or coworker

---

[3] According to the assessment form, a "mild" limitation is one that "does not seriously affect ability to function," a "marked" limitation "seriously interferes with the ability to function independently, appropriately and/or effectively," and an "extreme" limitation is "more severe than marked." (R. 392.)

7

and handling customary work pressures because Plaintiff was "unlikely [to be able] to handle work pressures." (R. 393.) Finally, Dr. Pilman opined that if Plaintiff were employed, Plaintiff's disorders would cause Plaintiff to miss work more than four days per month. (R. 393.) Dr. Pilman's prognosis for Plaintiff's disorders was "guarded."[4] (R. 391.)

### ii. Dr. Josif Sholomon

In August of 2010, Plaintiff began treatment with Josif Sholomon, M.D., for his primary medical needs. (R. 206.) Plaintiff visited Dr. Sholomon once every three months between August of 2010 and March of 2013.[5] (R. 206.) In March of 2013, Dr. Sholomon completed a report pertaining to Plaintiff's application for disability benefits. (R. 202–06.) Dr. Sholomon noted that Plaintiff had diagnoses for depression, anxiety and insomnia. (R. 205–06.) As to Plaintiff's physical ability to perform work-related activities, Dr. Sholomon opined that Plaintiff did not have any physical limitations. (R. 202.) Dr. Sholomon stated that Plaintiff suffers fatigue as a result of his depression and needs to rest for "several hours" before he can engage in any activity again. (R. 203.) Dr. Sholomon noted that Plaintiff had prescriptions to treat his depression, anxiety and insomnia and opined that he was "responding well to medication." (R. 205.)

### iii. Dr. Johanina McCormick — examining consultative source opinion

After Plaintiff applied for social security benefits, Johanina McCormick, Ph.D., examined Plaintiff to assess his limitations as they existed in May of 2013. (R. 208–11.) The examination

---

[4] "Guarded prognosis refers to a prognosis given by a physician [expressing that] the outcome of a patient's illness is in doubt." Taber's Cylcopedic Medical Dictionary, 914 (21st ed. 2009).

[5] The treatment notes and reports from Plaintiff's visits with Dr. Sholomon reflect physical sicknesses Plaintiff suffered and treatment Plaintiff was provided. (R. 255–324.) Because Plaintiff's physical ailments are not the basis for his disability application, (*see* R. 163–73), the Court does not recount Dr. Sholomon's treatment notes in this Memorandum and Order.

8

location was ten miles away from Plaintiff's home and Plaintiff traveled to the examination by "car service." (R. 208.) Plaintiff reported that he lived with his wife in an apartment. (R. 208.) Plaintiff also reported that he had a high school education, "last worked two years ago as an insurance agent," and "has not been able to work due to depression and anxiety." (R. 208.) Dr. McCormick noted that Plaintiff had been receiving psychiatric treatment with Dr. Pilman since 2009 and visited Dr. Pilman once a month. (R. 208.) Dr. McCormick also noted that Plaintiff was taking medications to treat his depression, anxiety and insomnia. (R. 208.)

Plaintiff reported that he awoke from sleep four times per night and suffered from "dysphoric[6] mood due to depressi[on]," "excessive apprehension and worry, restlessness, muscle tension," "short-term memory deficits" and "concentration deficits," as well as "palpitations, sweating [and] chest pains" during panic attacks. (R. 208–09.) Plaintiff reported that his depression and anxiety stemmed from his familial and financial issues. (R. 208–09.)

Dr. McCormick conducted a mental status examination of Plaintiff, which revealed an "adequate" "manner of relating [and] social skills," "poor[] groom[ing]," "appropriate" affect, "dysthymic"[7] mood, "mildly impaired" attention and concentration "due to emotional distress resultant to anxiety," "mildly impaired" recent and remote memory skills "due to emotional distress resultant to anxiety, depression and limited intellectual functioning" and "below average" cognitive functioning. (R. 209–10.) Dr. McCormick opined that:

---

[6] Dysphoria is defined as "as state of feeling unwell or unhappy." *Dysphoria Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dysphoria#medicalDictionary (last visited Sept. [Day], 2017).

[7] Dysthymia is defined as "mildly depressed or irritable mood often accompanying by other symptoms [such] as eating and sleeping disturbances, fatigue, and poor self-esteem." *Dysthymia Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dysthymia#medicalDictionary (last visited Sept. [Day], 2017).

> [Plaintiff] can follow and understand simple directions and instructions. He can perform simple tasks independently. He is mildly limited in maintaining attention and concentration. He can maintain a regular schedule. He can learn new tasks with help. He is mildly limited in performing complex tasks independently, he needs supervision. He can make appropriate decisions. He can relate adequately with others. He is markedly limited in appropriately dealing with stress. The difficulties are caused by symptoms of depression, anxiety, and short-term memory deficits. The results of the examination appear to be consistent with psychiatric problems, and this may significantly interfere with [Plaintiff's] ability to function on a daily basis.

(R. 210–11.) Dr. McCormick diagnosed Plaintiff with depressive disorder, not otherwise specified, and anxiety disorder, not otherwise specified. (R. 211.) Dr. McCormick's prognosis for Plaintiff's disorders was fair. (R. 211.)

### iv. Dr. S. Hou — non-examining consultative source opinion

In May of 2013, Dr. S. Hou,[8] a medical consultant for the Commissioner, reviewed the documents in Plaintiff's disability-benefits-application file and issued a report with his findings regarding Plaintiff's limitations. (R. 19, 53–61.) Dr. Hou opined that Plaintiff's disorders, alone or in combination, did not meet or medically equal a disorder in Appendix 1 of the Social Security Regulations. (R. 56.)

Dr. Hou's opinions on Plaintiff's limitations were as follows. Regarding understanding and memory, Plaintiff had no significant limitations in his "ability to remember locations and work-like procedures" and "understand and remember very short and simple instructions"; and moderate limitations in "his ability to understand and remember detailed instructions." (R. 58.) Regarding concentration and persistence, Plaintiff had no significant limitations in his "ability to carry out very short and simple instructions," "work in coordination with or in proximity to

---

[8] The record does not contain Dr. Hou's full name or the discipline of his doctoral degree.

others without being distracted by them" and "make simple work-related decisions"; and moderate limitations in his "ability to carry out detailed instructions," "maintain concentration for extended periods," "sustain an ordinary routine without special supervision," "perform activities within a schedule, maintain regular attendance, [] be punctual within customary tolerances," "complete a normal workday and workweek without interruptions from psychologically based symptoms and [] perform at a consistent pace without an unreasonable number and length of rest periods." (R. 58–59.) Regarding social interaction, Plaintiff had no significant limitations in his "ability to ask simple questions or request assistance," "accept instructions and respond appropriately to criticism from supervisors," "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," "maintain socially appropriate behavior and [] adhere to basic standards of neatness and cleanliness"; and moderate limitations in his "ability to interact appropriately with the general public." (R. 59.) Regarding adaptation, Plaintiff had no significant limitations in his "ability to be aware of normal hazards and take appropriate precautions," "travel in unfamiliar places or use public transportation" and "set realistic goals or make plans independently of others"; and moderate limitations in his "ability to respond appropriately to changes in the work setting." (R. 59–60.) Dr. Hou completed the report relying on a record containing Dr. Pilman's treatment notes, but not his assessment, and Dr. McCormick's report. (R. 54–56.)

    **c.   The ALJ's decision**

The ALJ issued his decision on December 29, 2014, finding that Plaintiff was not disabled. (R. 11–22.) The ALJ applied the five-step analysis for determining whether an individual is disabled and may receive social security benefits. (R. 11–22.) At step one, the ALJ found that Plaintiff was not working and had not engaged in substantial gainful employment since the alleged onset of disability date. (R. 16.) At step two, the ALJ found that Plaintiff had

severe impairments of major depressive disorder and generalized anxiety disorder. (R. 16.) At step three, the ALJ found that the impairments, individually or combined, failed to meet or equal the severity of an impairment listed in Appendix 1 of the Social Security Regulations. (R. 16–17.)

At step four, the ALJ found that:

> [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels with the following non[-]exertional limitations: He can remember, understand, and carry out simple instructions. He can make simple work[-]related decisions. He can maintain a regular schedule. He can maintain attention and concentration for rote work and perform a low stress job, which is defined as no close interpersonal contact with the general public and not requiring high-volume or assembly-line production quotas.

(R. 17–18.) In making the step-four RFC determination, the ALJ recounted much of the evidence and then assigned "partial weight" to all of the physicians' opinions. (R. 19–20.) The ALJ found Plaintiff's testimony "not entirely credible." (R. 18.) At step five, the ALJ found that, based on Plaintiff's RFC, Plaintiff could not perform his past relevant work, but could perform a significant number of jobs that existed in the national economy as testified to by vocational expert Green. (R. 21.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*,

805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

    b.   **Availability of benefits**

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the SSA. To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity

13

that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

   c. **Analysis**

Plaintiff argues that the ALJ erred by failing to give controlling weight to Dr. Pilman, Plaintiff's treating physician, in determining Plaintiff's RFC. (Pl. Mem. 21–24.) The Commissioner argues that the ALJ's decision not to give controlling weight to Plaintiff's treating physicians was supported by substantial evidence because there was conflicting evidence in the

14

record regarding Plaintiff's limitations, which conflict the ALJ was entitled to resolve. (Comm'r Mem. 10–17, 18–19.) For the reasons explained below, the Court finds that the ALJ violated the treating physician rule by omitting a critical part of Dr. Pilman's opinion from Plaintiff's RFC assessment.

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[9] 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount

---

[9] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502).

of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion . . . .").

On the other hand, a "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. In general, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. This is because "consultative exams are often brief, are generally performed without the benefit or review of [the] claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *see also Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011)

16

("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.'" (quoting *Cruz*, 912 F.2d at 13)).

The ALJ erred in his determination of Plaintiff's RFC because, while he assigned partial weight to Dr. Pilman's contradicted medical opinions, Plaintiff's RFC assessment did not include Dr. Pilman's uncontradicted opinion that Plaintiff likely would miss more than four days of work per month. The Second Circuit has held that a medical opinion stating that a social security claimant likely may miss work multiple times per month is probative as to whether the claimant is disabled under the Social Security Regulations. *See Greek v. Colvin*, 802 F.3d 370, 376 (2d. Cir. 2015) (holding that because the plaintiff "could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting [that] opinion was not harmless"); *Lesterhuis*, 805 F.3d at 88 (remanding a case to an ALJ because "nothing in the record contradicts [the treating physician's] conclusion about the number of days each month that [the plaintiff] is likely to be absent from work"); *Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 700 (2d Cir. 2013) (remanding for the ALJ to consider an opinion by one of the plaintiff's treating physicians, which opinion stated that the plaintiff likely would miss more than four days per month).

Dr. Pilman opined explicitly that Plaintiff "is likely to be absent from work as a result of psychiatric symptoms" "[m]ore than [four] days per month." (R. 393.) In recounting the evidence, the ALJ noted that Dr. Pilman was a treating physician and accorded "partial weight" to Dr. Pilman's opinions because Dr. Pilman's mental status examinations of Plaintiff "consistently demonstrate[d] normal to mild cognitive limitations." (R. 32). However, the ALJ

17

did not mention Dr. Pilman's opinion regarding Plaintiff's likely monthly absences in rendering his decision, and did not include the information in his determination of Plaintiff's RFC. (*See* R. 16–20).

The ALJ's omission of Plaintiff's likely absences from work is notable for two reasons, (1) the lack of a contradictory medical opinion and (2) the vocational expert's testimony that there would be no jobs for a person with Plaintiff's determined RFC who had to miss work at least one day per month.

First, there was no medical evidence in the record that contradicted Dr. Pilman's opinion regarding Plaintiff's likely absences. Dr. Sholomon opined that Plaintiff's depression and anxiety caused fatigue that required Plaintiff to rest for "several hours" before Plaintiff "can engage in activities again." (R. 203.) Dr. Sholomon provided no direct opinions regarding Plaintiff's likelihood of absences from work if he were employed. (*See* R. 202–06.) Dr. Hou opined that Plaintiff had moderate limitations in his "ability to . . . maintain regular attendance" and "complete a normal . . . workweek without interruptions from psychologically based symptoms." (R. 59.) The only possible contradictory opinion regarding Plaintiff's likely absences is Dr. McCormick's opinion that Plaintiff "can maintain a regular schedule." (R. 210.) Even if the ALJ considered Dr. McCormick's opinion as contradictory to Dr. Pilman's opinion regarding Plaintiff's likely absences, remand is nevertheless appropriate because the ALJ failed to include any such reasoning or explanation for rejecting Dr. Pilman's opinion in his decision.[10]

---

[10] To the extent the ALJ rejected Dr. Pilman's opinions on the basis that Dr. Pilman's "[m]ental status examinations consistently demonstrate[d] normal to mild cognitive symptoms," (*see* R. 20), such rejection was erroneous because the ALJ may only reject Dr. Pilman's opinions based on contradictory medical opinions, not based on the ALJ's interpretation of Plaintiff's medical records. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("The ALJ erred in rejecting the opinions of [the plaintiff's treating] physicians solely on the basis that the opinions

*See Rugless*, 548 F. App'x at 700 (holding that remand was required because "we need some explanation of why there was no discussion in the ALJ's decision of [the] opinion that [plaintiff] would have to miss more than four days per month"); *see also Lesterhuis*, 805 F.3d at 88 (remanding a case to an ALJ because "nothing in the record contradicts [the treating physician's] conclusion about the number of days each month that [the plaintiff] is likely to be absent from work").

Second, at the hearing, the ALJ asked the vocational expert for available jobs for a hypothetical claimant with Plaintiff's RFC and the additional limitation of "miss[ing] more than one day of work per month," and the vocational expert testified that no jobs would be available for such a person. (R. 50.) The ALJ's question to the vocational expert about the effect of Plaintiff's absences, and the vocational expert's response, highlights the ALJ's error in failing to include Dr. Pilman's opinion regarding Plaintiff's likely absences from work in the RFC determination. *See Greek*, 802 F.3d at 376 (holding that because the plaintiff "could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting [that] opinion was not harmless").

---

allegedly conflicted with the physicians own clinical findings. . . . We need not address whether the treating physicians' opinions bound the ALJ . . . because in this case the Commissioner failed to offer and the ALJ did not cite *any* medical opinion to dispute the treating physicians' conclusions." (citations omitted)); *cf. Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) ("[The plaintiff] argues that it is improper to reject a treating physician's opinion solely based upon the treating physician's own treatment notes. . . . We [have] held that 'while an ALJ is free to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him.' Here, there was such a contrary opinion." (alterations omitted) (quoting *Balsamo*, 142 F.3d at 80–81)).

Accordingly, the ALJ's RFC assessment was flawed and requires remand of this case.[11]

III. **Conclusion**

For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion for judgment on the pleadings. The Court vacates the Commissioner's decision and remands this action for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

    s/ MKB
MARGO K. BRODIE
United States District Judge

Dated: September 26, 2017
      Brooklyn, New York

---

[11] Because the Court finds that remand is proper on the basis that the ALJ erred in failing to consider Dr. Pilman's opinion regarding Plaintiff's likely absences in assessing Plaintiff's RFC, the Court does not address Plaintiff's argument that the ALJ erred in determining at Step Three that Plaintiff's disabilities did not meet or medically equal a disability in Appendix 1 of the Social Security Regulations, (Pl. Mem. 18–21). *See Foxman v. Barnhart*, 157 F. App'x 344, 347–48 (2d Cir. 2005) (declining to address arguments presented by the parties that were different from the bases underlying the Court's decision to remand).